## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SHANNA HUFF,<br><br>     **Plaintiff,**<br> **v.**<br><br>**DRESHER HILL HEALTH &**<br>**REHABILITATION CENTER**<br>   **Defendant.** | **CIVIL ACTION**<br><br>**NO.  21-1773** |

## <u>MEMORANDUM OPINION</u>

**Goldberg, J.**                     **June 22, 2023**

   Plaintiff Shanna Huff has sued her former employer, Defendant Dresher Hill Health & Rehabilitation Center, raising claims under the Americans with Disabilities Act ("ADA"), the Family and Medical Leave Act ("FMLA"), the Families First Coronavirus Response Act ("FFCRA"), the Pennsylvania Human Relations Act ("PHRA"), and Pennsylvania defamation law.  Plaintiff contends that, during the COVID-19 pandemic, Defendant discriminated and retaliated against her for using leave and seeking accommodations to care for her son, who has sickle cell anemia.  Defendant moves for summary judgment on the entirety of Plaintiff's Complaint.  For the following reasons, I will grant the Motion and enter judgment in favor of Defendant.

## I.  STATEMENT OF FACTS

   In support of its Motion for Summary Judgment, Defendant provided a numbered statement of undisputed facts together with accompanying evidentiary references.  Although Plaintiff submitted a response brief, she neither addressed Defendant's statement of facts nor submitted her own statement of facts.  In fact, Plaintiff provides only three pieces of evidence in support of all of her claims:  (1) four pages of her deposition testimony; (2) a "PreCheck" employment report; and (3) one page of the deposition of her supervisor, Ryan Gallagher.

Given Plaintiff's failure to respond to Defendant's undisputed facts, and under Federal Rule of Civil Procedure 56(e)(2), I may consider Defendant's assertions of fact undisputed for purposes of this Motion.  Nonetheless, in the interest of providing thorough consideration, I have independently reviewed Defendant's cited evidence.  To the extent that evidence supports the asserted fact, I cite only to Defendant's statement of undisputed facts ("DSUF").

### A.        <u>Plaintiff's Hiring</u>

Defendant is a skilled nursing facility located in Fort Washington, Pennsylvania.  (DSUF ¶ 1.) Ryan Gallagher, the Nursing Home Administrator for Defendant, recruited Plaintiff for the position of Activity Director based on his previous experience with Plaintiff at another nursing home facility.  (<u>Id.</u> ¶¶ 3–5.)  In October 2018, Plaintiff was hired by Defendant as the Activity Director.  (<u>Id.</u> ¶ 2.)  In her role as Activity Director, Plaintiff was required to work throughout the facility, and the job description noted that the position was "subject to exposure to infectious waste, diseases, conditions, etc., including TB and the AIDS and hepatitis B virus."  (<u>Id.</u> ¶¶ 7–8.)

### B.        <u>Plaintiff's Promotion to Payroll Coordinator</u>

In July 2019, Plaintiff received a promotion to Payroll Coordinator.  (<u>Id.</u> ¶¶ 9–10.)  Her main responsibility was reconciling payroll, which included processing and verifying time entries on a daily basis and preparing daily payroll to ensure timely processing.  (<u>Id.</u> ¶ 12.)  She was also responsible for inputting employees' hours for bonuses, callouts, and PTOS, including her own.  (<u>Id.</u> ¶ 13.)  As required for the position, Plaintiff acknowledged that she had a background understanding of the laws and regulations concerning payroll administration in nursing care facilities, as well as the Fair Labor Standards Act, Family and Medical Leave Act, Americans with Disabilities Act, Occupational Safety and Health Act, and Workers' Compensation.  (<u>Id.</u> ¶¶ 14–15.)

When Plaintiff assumed the duties of Payroll Coordinator, she was to work twenty hours per week as a Payroll Coordinator and twenty hours per week as Activity Director.  She remained a full-time employee paid on an hourly basis for eighty hours per two-week period.  (<u>Id.</u> ¶¶ 16–19.)

### C.    Defendant's Employee Policies

Upon hiring, Plaintiff was provided with Defendant's Employee Handbook (the "Handbook"), which contains a progressive discipline policy based upon the severity of infractions committed by employees.  (Id. ¶¶ 20–21.)  This policy identifies a number of "critical offenses" which could result in immediate discharge, including misrepresentation or falsification of resident or work records, having your timecard punched by another or punching another employee's timecard, dishonesty in any form including theft or misappropriation, absence from any scheduling shift without notification, and refusal to carry out work assignments as directed.  (Id. ¶ 22.)  The Handbook also identifies minor offenses, including absence without proper notification to the department head at least two or four hours prior to the scheduled shift.  (Id. ¶ 23.)  Although Plaintiff had several instances of failing to timely call out, she was never disciplined.  (Id. ¶ 24.)

The Handbook also contains an Equal Employment Opportunity Provision, which includes an anti-retaliation provision and a provision prohibiting discrimination and harassment, with accompanying procedures for reporting such prohibited behavior.  (Id. ¶¶ 28–29.)  Detailed information regarding Defendant's FMLA policies is also included.  (Id. ¶ 34.)

Plaintiff was also provided a Code of Conduct and Facility Attendance Policy.  The Code of Conduct states that employees are to engage in honest communications and required candor and honesty from individuals in the performance of their responsibilities.  (Id. ¶¶ 26–27.)  The Facility Attendance Policy states that any employee who fails to work without notification for a period of one day will be considered to have voluntarily terminated their employment.  (Id. ¶ 31.)

### D.    Plaintiff's Use of Leave

Plaintiff's son has suffered from sickle cell anemia his entire life.  (Id. ¶ 37.)  In September 2019, Plaintiff sought and was approved for intermittent FMLA leave to care for him during his sickle cell crises.  As such, she was familiar with the process to request FMLA leave.  (Id. ¶¶ 38–40.)

On March 2, 2020, Plaintiff called her supervisor, Ryan Gallagher, and advised that she was using an FMLA day.  (Id. ¶ 41.)  On March 12, 2020, Plaintiff called off for "women issues" and utilized paid time off ("PTO time").  (Id. ¶ 43.)  On March 13, 2020, Plaintiff called off again and said that her son had a fever, and she utilized no PTO time.  (Id. ¶ 44.)

In mid-March, the COVID-19 pandemic took hold.  Plaintiff did not work on March 19, 20, 22, 23, 24, 25, the morning of March 26, April 20, the afternoon of April 22, and the afternoon of April 23 and April 24, 2020.  (Id. ¶¶ 45–46.)  On March 22, 2020, Plaintiff texted Gallagher asking about work at home options because her son's doctor did not want her to put her son at risk.  (Id. ¶ 48.)  Gallagher responded that he would look into it and follow up.  (Id. ¶ 49.)

On March 24, 2020, Plaintiff sent the following text to Gallagher:

> GM.  I'm waiting to speak with my son dr today so a decision can be made.  I would like to have my office complete cleaned and sanitized as well as my area downstairs.  I know you and corporate may think this is minor because it's my son and not me but if you understand Sicnle [sic] Cell Disease you would understand the concern.  His dr. [i]s not suggesting these things just because.  At this point my sons [sic] health is top priority.  I'm in no way quitting my job or walking away.  I have asked for accommodations that was denied because I don't have symptoms.  I don't have any answers at this point and the number in my community is growing.  I will be speaking to a number of people today regarding my situation and move from there.  I spoke with my staff and the schedule for this week is already complete as well as 1:1 visits.  I let them know that I will still work on the calendar for the next 2 weeks as well.  I honestly do not expect everyone to understand because Sickle Cell is a disease that's not talked about widely enough and no one knows the dangers my son could face and this would be life or death for him.  Myself as well as I am also immune suppressed with RA.  I hope you understand that I need to make our health a priority and I have a duty to protect my son by all means.  I have not left my house since Thursday of last week for the sake of him.  So no I'm no out shopping at the grocery stores or going out just because.  I will have more answers today.

(Def.'s Ex. B, Dep. of Shanna Huff ("Huff Dep."), exh. 22.)  Plaintiff explained that she was not seeking leave because her son was sick but only because she did not want to send him to school due to the threat of COVID.  (Huff Dep.  97:13–98:7, 100:23–102:5.)  In response, Gallagher instructed Plaintiff to have her son's doctor send him a note regarding his recommendations.  (DSUF ¶ 56.)

Upon receipt of the doctor's note, Gallagher made an exception to allow Plaintiff to work from home, even though other employees were not granted this exception.  (DSUF ¶¶ 57–58.)  On March 26, 2020, Gallagher sent Plaintiff an email confirming that, effective March 27, 2020, Plaintiff would be able to work remotely part time as a Payroll Coordinator only.  Her hours would be 8 a.m. to 10 a.m. and 3 p.m. to 5 p.m. Monday through Friday.  (Huff Dep., exh. 15.)  Because the residents at Defendant's facility were not able to participate in communal activities in March and April of 2020, Plaintiff was not replaced as Activities Director and was permitted to resume that position when she returned to the facility in person.  (Id. ¶¶ 64, 66–67.)

On April 3, 2020, Plaintiff emailed Gallagher that her son's doctor said it was up to her comfort level about returning to work and that she wanted to know if anyone had any symptoms or tested positive. She indicated that if there were none, she was willing to come back to the facility that Monday.  (Huff Dep., exh. 18.)  On Tuesday, April 7, 2020, Gallagher informed her that there had been a positive case, and the following day, Plaintiff responded that she thought it was best that she wait until next Monday to return.  (Huff Dep., exh. 20.)  Plaintiff worked from home on April 9 and 10, 2020.  (DSUF ¶ 73.)

On April 13, 2020, Plaintiff emailed Gallagher for an update about COVID cases in the building, and Gallagher asked that Plaintiff call him so they could talk.  (DSUF ¶¶ 74–75.)  Plaintiff told him that she was coming in, so they could talk face to face.    (Huff Dep., exh. 20.)  She came in for the whole day but did not return the following day, choosing instead to work from home from 8:30 a.m. to 10:30 a.m., and from 3:00 p.m. to 5:00 p.m.  (DSUF ¶¶ 76–79.)  At 8:00 a.m. on April 14th, however, Plaintiff had messaged Human Resources Director, Gionna Banks, asking if Ms. Banks could run payroll that day because she could not do it.  (Id. ¶ 80.)  At 8:33 a.m., Plaintiff informed Banks that she was "going to Walmart real quick" and would "hit [Banks] up" when she got back.  (Huff Dep., exh. 17.)

The following day, Plaintiff told Banks that she was not coming in to work because she did not want to risk it, but was still going to do twenty hours a week of payroll.  (Id.)  On April 16, 2020, at 9:41 a.m., Plaintiff told Banks she was doing payroll, but asked Banks to "gather all callouts and ptos" from

this week so she could pick them up.  Banks also worked on inputting hazard pay, even though these were Plaintiff's duties.  (Id.; DSUF ¶¶ 88–89.)  On April 17, 2020, Plaintiff submitted time from 9:00 a.m. to 11:00 a.m. only.  (DSUF ¶ 90.)

On April 20, 2020, Plaintiff texted Gallagher and called out, without giving a reason, and she did not respond when he asked if everything was okay.  (Huff Dep., exh. 22.)  On April 23, 2020, Plaintiff submitted time claiming to have worked from 9:00 a.m. to 11:00 a.m., but that day she did not log in to Defendant's Citrix server—a virtual private network that employees had to access to use any of Defendant's systems.  (DSUF ¶¶ 92–93, 100–01.)  Gallagher was informed that Plaintiff had asked Banks to put her time in for her, and this was a "big red flag" because Plaintiff's main responsibility was to be sure that time was entered properly, yet she did not put in her own that day.  (DSUF ¶¶ 94, 102.)  Plaintiff claims that she had "major laptop issues" that day and asked Banks to input her time.  (Huff Dep. 237:17–238:11.)

On April 27, 2020, Plaintiff told Gallagher that her laptop was broken, and Gallagher submitted a request for an additional laptop, stating that the "payroll person is working from home and will need one to process payroll."  (Def.'s Ex. A, Dep. of Ryan Gallagher ("Gallagher Dep."), exh. Q.)  That same day, Gallagher received a report from the Information Technology ("IT") Department showing that Plaintiff had not logged into Citrix from any device, meaning she could not have accessed any other program or documents.  He also learned that Banks was being requested to do an overwhelming amount of payroll tasks.  (DSUF ¶¶ 105–107.)  Gallagher also received a report from Ultipro, the time tracking program used to make manual edits to payroll, and it showed that, for the week of April 20, Plaintiff had made no manual edits, while Gionna Banks had made hundreds during that time.  (Id. ¶ 109.)

On April 28, 2020, Gallagher and Banks talked with Plaintiff via telephone and asked her about her work on April 23, 2020.  Plaintiff stated that she had completed payroll, answered emails and webinars, and had logged into Citrix to do so.  (DSUF ¶ 116.)  At her deposition, Plaintiff claimed that Gallagher and Banks had not asked her specifically about April 23rd.  (Huff Dep. 267:18–22.)  According

6

to Gallagher, however, Plaintiff refused to participate in giving a statement about what she did on April 23rd.  (Gallagher Dep.  151:14–152:10.)  He indicated that he repeatedly asked Plaintiff for a statement, and Plaintiff simply asked whether he had "bigger fish to fry."  (Gallagher Dep. 169:9–15.)

On April 29, 2020, Gallagher and Banks contacted Plaintiff again and asked her to provide a statement regarding her productivity the previous week, but she refused to do so and became defensive.  (DSUF ¶¶ 123–24.)  At that point, Gallagher advised Plaintiff that she was being suspended pending an investigation because she had not provided the requested information.  (DSUF ¶ 124.)

On April 30, 2020, Gallagher and Banks spoke with Plaintiff via telephone, and Plaintiff again refused to provide a statement regarding her time worked the week before.  (DSUF ¶ 127.)  Plaintiff also requested that she see a copy of any statement she chose to provide, and Gallagher offered to email it to her.  Plaintiff then stated that she would come into the building on May 1, 2020, and then she retracted and said she would "get to the building when [she] get to the building."  (DSUF ¶ 128.)  As a result, Gallagher informed Plaintiff that she was terminated effective immediately.  (DSUF ¶ 130; Gallagher Dep., exh. T.)  Gallagher testified at his deposition that Plaintiff was fired for falsifying records and insubordination during an investigation.  (Gallagher Dep. 160:21–25, 165:12–168:20.)

### E.      Plaintiff's Application for a New Position

In April or May 2021, Plaintiff applied for employment with Brooke Glen Behavioral Health ("Brooke Glen") for a mental health technician position.  (DSUF ¶ 173.)   Brooke Glen made a conditional job offer pending the results of a background check, which Plaintiff authorized and understood would include contacting previous employers.  (DSUF ¶¶ 173–74.)   Brooke Glen used a service from a company called PreCheck for employment verification, which provides a report verifying information received from the applicant.  (DSUF ¶¶ 176–77.)  Plaintiff's report was created by an employee of PreCheck, who spoke with Gionna Banks.  Based on that conversation, the report noted that Plaintiff was discharged from Defendant for falsification of records.  (Huff Dep., exh. 31.)

7

By email dated June 2, 2021, Brooke Glen rescinded its offer of employment to Plaintiff. (DSUF ¶ 181.) The email stated that, "[a]fter reviewing your employment history and PreCheck background report, you do not meet the minimum requirements for the Mental Health Technician position. We require a Bachelor's degree in human services or 2 years' experience in direct care plus your High School Diploma that must be verified by our third party." (Huff Dep., exh. 32.) When Plaintiff wrote back that she "explained [her] education and experience during the interview process," Brooke Glen indicated, "[w]e verify all employment through PreCheck and what they returned to us was significantly different than what your resume indicated. In addition[,] they disclosed the reason for termination which concerned us." (Huff Dep., exh. 32.) The PreCheck report revealed several discrepancies in Plaintiff's reason for leaving Defendant, dates of employment with Defendant, position held with Defendant, and Defendant's employment with a prior employer. (DSUF ¶¶ 185–190.)

### F.   Procedural History

On April 15, 2021, Plaintiff filed a Complaint and, thereafter, filed an Amended Complaint setting forth the following claims: (1) disparate treatment under the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101, et seq.; (2) interference under the Family & Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, et seq.; (3) retaliation under the FMLA; (4) interference under the Families First Corona Response Act ("FFCRA"); (5) violation of the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. § 951, et seq.; and (6) defamation under Pennsylvania law.

## II.   STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 states, in pertinent part:

> A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.

Fed. R. Civ. P. 56(a).  "Through summary adjudication, the court may dispose of those claims that do not present a 'genuine dispute as to any material fact' and for which a jury trial would be an empty and unnecessary formality."  Capitol Presort Servs., LLC v. XL Health Corp., 175 F. Supp. 3d 430, 433 (M.D. Pa. 2016).  A factual dispute is "material" if it might affect the outcome of the suit under the applicable law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  An issue is "genuine" only if there is a sufficient evidentiary basis that would allow a reasonable factfinder to return a verdict for the non-moving party.  Id.

The initial burden is on the moving party to adduce evidence illustrating a lack of genuine, triable issues.  Hugh v. Butler Cnty. Family YMCA, 418 F.3d 265, 267 (3d Cir. 2005).  Once the moving party satisfies its burden, the non-moving party must, in rebuttal, present sufficient evidence of a genuine issue.  Santini v. Fuentes, 795 F.3d 410, 416 (3d Cir. 2015).  The court must then resolve all doubts as to the existence of a genuine issue of material fact in favor of the non-moving party.  Saldana v. Kmart Corp, 260 F.3d 228, 232 (3d Cir. 2001).  Summary judgment is appropriate if the non-moving party provides merely colorable, conclusory or speculative evidence.  Anderson, 477 U.S. at 249.  There must be more than a scintilla of evidence supporting the non-moving party and more than some metaphysical doubt as to the material facts.  Id. at 252.  Unsubstantiated arguments made in briefs are not considered evidence of asserted facts.  Versarge v. Twp. of Clinton, 984 F.2d 1359, 1370 (3d Cir. 1993).  Moreover, "a party resisting a [Rule 56] motion cannot expect to rely merely upon bare assertions, conclusory allegations or suspicions."  Gans v. Mundy, 762 F.2d 338, 241 (3d Cir. 1985) (citing Ness v. Marshall, 660 F.2d 517, 519 (3d Cir. 1981)).

III.   **DISCUSSION**

A.   **Claims Under the ADA and PHRA**

Defendant first seeks summary judgment on Plaintiff's claims for associational disability under the ADA and the PHRA.[1]

The ADA prohibits employers from discriminating against "a qualified individual on the basis of disability."  42 U.S.C. § 12112(a).  The ADA defines a "qualified individual" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions" of the job.  42 U.S.C. § 12111(8).  The protections of the ADA also extend to qualified individuals because of their association with a disabled individual and provide that employers are prohibited from "excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association."  42 U.S.C. § 12112(b)(4).  In other words, the ADA forbids adverse employment actions against employees because of their own condition, as well as employees deemed protected "because of the known disability of an individual with whom the qualified individual is known to have a relationship or association," *i.e.*, "association discrimination."  Reddinger v. Hosp. Central Servs., Inc., 4 F. Supp. 2d 405, 408 (E.D. Pa. 1998).

The United States Court of Appeals for the Third Circuit has enumerated certain circumstances under which a plaintiff might establish a claim of associational discrimination.

> (1) termination based on a disabled relative's perceived health care costs to the company; (2) termination based on fear of an employee contracting or spreading a relative's disease; and (3) termination because an employee is somewhat distracted by a relative's disability, yet not so distracted that he requires accommodations to satisfactorily perform the functions of his job.

---

[1]   The analysis under the ADA and the PHRA is the same, and courts often interpret them consistently.  See Kelly v. Drexel Univ., 94 F.3d 102, 105 (3d Cir. 1996).  Thus, my analysis under the ADA is equally appliable to Plaintiff's claim under the PHRA.

Erdman v. Nationwide Ins. Co., 582 F.3d 500, 511 n.7 (3d Cir. 2009) (citing Larimer v. Int'l Bus. Machs. Corp., 370 F.3d 698, 700 (7th Cir.2004)).

To establish a *prima facie* case of discrimination under an associational theory, the plaintiff must show that the employer "was motivated by [the relative's] disability rather than by [the plaintiff's] stated intention to miss work; in other words, that she would not have been fired if she had requested time off for a different reason." Erdman, 582 F.3d at 510 (citing Den Hartog v. Wasatch Academy, 129 F.3d 1076, 1085 (10th Cir. 1997) (requiring association provision plaintiffs to show that an "adverse employment action occurred under circumstances raising a reasonable inference that the disability of the relative or associate was a determining factor in the employer's decision")). The Third Circuit allows associational discrimination claims to proceed if the employee was "fired because her employer feared that she *might* miss work to care for a disabled relative even though she had not taken or requested time off." See id. (emphasis in original). The Court reasoned that "a decision motivated by unfounded stereotypes or assumptions about the need to care for a disabled person may be fairly construed as 'because of the . . . disability' itself." Id. at 511 (quoting 42 U.S.C. § 12112(b)(4)).

In all ADA discrimination cases, "[o]nce a plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action." Stouch v. Twp. of Irvington, 354 F. App'x 660, 666 (3d Cir. 2009) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–05 (1973)). "The plaintiff then bears the burden of establishing that this proffered reason is a pretext for discrimination." Id.; Walton v. Mental Health Ass'n of Southeastern Pennsylvania, 168 F.3d 661, 668 (3d Cir. 1999).

My review of the record reflects that Plaintiff has failed to point to any evidence that could establish that her termination was motivated by any association between her and her disabled son. Indeed, by all accounts, prior to the pandemic, Plaintiff was granted intermittent FMLA leave to provide care for her son on an as-needed basis. When the pandemic hit, Defendant provided Plaintiff with an accommodation to allow her to work at home. The undisputed evidence shows that Plaintiff repeatedly

failed to perform her job functions while working at home and falsely submitted time sheets attesting that she was working.

Plaintiff argues that a jury could reasonably conclude that Defendant's reason for terminating her was pretextual or that Defendant had a mixed motive.  She contends that a plaintiff need not prove that associational disability was the sole or most important factor motivating the adverse action, only that it was a "negative factor" in the employer's adverse employment decision.  (Pl.'s Resp. Opp'n Summ. J. 6–7 (citing Egan v. Delaware River Port Auth., 851 F.3d 263, 272 (3d Cir. 2017)).  Plaintiff references Gallagher's deposition testimony wherein he testified that although his April 30, 2020 termination email identified Plaintiff's refusal to provide a statement as the basis for the decision, it did not say that was the only reason she was terminated.  (Gallagher Dep. 167–68.)  From this testimony, Plaintiff argues that "a jury should decide whether Plaintiff's intermittent FMLA and her association with a disabled person were factors in Defendant's decision to terminate Plaintiff's employment."  (Pl.'s Resp. Opp'n Summ. J. 7.)

Plaintiff's referenced deposition read in context, however, allows no such reasonable inference:

> Q.  So at what point did you conclude that she falsified her records/documents regarding her time?
>         . . .
> A.  Shanna refused to provide multiple times what she did on the 23rd. Initially she said that she logged into certain systems, and when we checked, that was not there.
>
> Q. You testified that she was terminated for falsifying time and records, correct?
>
> A.  It's dual.  I believe one leads into the other.
>
> Q.  Yes or no, was she fired—  . . . Yes or no, was she fired for— terminated for falsifying records or documents?
> . . .
> A.  Yeah, Shanna Huff, she was—she was terminated for not providing a statement.
>
> Q.  Okay.  So she was not fired for falsifying records or documents? Respectfully, I'm entitled to an answer to this question, and you're being a bit evasive at this point.

MS. MENICHINI:  He's trying to give you an explanation.  I think he made it clear.  You just want him to say yes or no to the question without being able to provide the context.

Q.  Here's my issue, and maybe I'll just explain it, and I need your help understanding because I wasn't there.  Okay?  On April 29, 2020, you testified that you hadn't made that decision to terminate Ms. Huff, correct?

A.  Correct.

Q.  All right.  You did make that decision on April 30, 2020, correct?  At least in this statement, you explicitly say she's being terminated for refusing to provide a statement, correct?

A.  Yes.

Q.  Okay.  But you're also testifying, it's not stated in this statement, that she was terminated for falsifying documents, correct?

MS. MENICHINI:  Object to the form.  That document says he informed her that due to her refusing to provide a statement, her termination is effective immediately.  It doesn't actually say that's the only reason she's being terminated.
. . .
Q.  My question:  Is there anything in this statement regarding her falsifying documents or records?  If there is, please point to it.  Just reference the line.  If no, no.  If yes, just point to the line, please.

A.  In this document here, there's nothing in relation to her falsifying records because she never participated in the investigation in which we were asking her what she was doing with her time.

(Gallagher Dep. 166:1–168:9.)

Nothing in this testimony allows any inference, or even suspicion, that among the reasons Plaintiff was fired, one of them was her association with her son.  Rather, this testimony pertains solely to whether Plaintiff was fired due to her refusal to give a statement and/or falsification of time records. Under Fed. R. Civ. P. 56, once Defendant satisfies its burden of showing the absence of any genuine, triable issue, the burden shifts to Plaintiff to present sufficient evidence of a genuine issue of material fact.  Santini v. Fuentes, 795 F.3d 410, 416 (3d Cir. 2015).  Plaintiff cannot "expect to rely merely upon bare assertions, conclusory allegations or suspicions" that Defendant *might* have also terminated her

because of her son's disability.  Gans v. Mundy, 762 F.2d 338, 341 (3d Cir. 1985) (citing Ness v. Marshall, 660 F.2d 517, 519 (3d Cir. 1981)).  Absent at least a modicum of evidence on which a jury could find that Defendant was prompted by discriminatory motives, summary judgment in favor of Defendant is warranted.

### B.  FMLA Claims

The FMLA "entitles eligible employees to take up to 12 work weeks of unpaid leave annually for any of several reasons, including the onset of a 'serious health condition' in an employee's spouse, child, or parent."  Nevada Dep't of Human Res. v. Hibbs, 538 U.S. 721, 724 (2003) (citing 29 U.S.C. § 2612(a)(1)(C)). The statute contains "two relatively distinct types of provisions."  Callison v. City of Philadelphia, 430 F.3d 117, 119 (3d Cir. 2005).  First, an employer is prohibited from acting "to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under" the FMLA. Id. (citing 29 U.S.C. § 2615(a)(1)).  A claim arising under section § 2615(a)(1) is known as an "interference" claim.  Id.  Second, the FMLA makes it "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful" by the FMLA.  29 U.S.C. § 2615(a)(2).  A claim under section § 2615(a)(2) is referred to as a "retaliation" or "discrimination" claim.  Callison, 430 F.3d at 119.  Defendant has moved for summary judgment on both of Plaintiff's FMLA claims.

### 1.  FMLA Interference

To make out a claim of interference under the FMLA, a plaintiff must establish: (1) he or she was an eligible employee under the FMLA; (2) the defendant was an employer subject to the FMLA's requirements; (3) the plaintiff was entitled to FMLA leave; (4) the plaintiff gave notice to the defendant of his or her intention to take FMLA leave; and (5) the plaintiff was denied benefits to which he or she was entitled under the FMLA.  Johnson v. Cmty. Coll. of Allegheny Cnty., 566 F. Supp. 2d 405, 446 (W.D. Pa. 2008).

14

Under the fifth element—denial of benefits to which the plaintiff was entitled under the FMLA—an employee "must show that he was entitled to benefits under the FMLA and that his employer illegitimately prevented him from obtaining those benefits."  Sarnowski v. Air Brooke Limousine, Inc., 510 F.3d 398, 401 (3d Cir. 2007); see also Sommer v. The Vanguard Grp., 461 F.3d 397, 399 (3d Cir. 2006) (noting that an interference claim requires an employee to show that he was not only entitled to FMLA benefits but that he was denied those benefits).  The Third Circuit has clearly stated that the denial of benefits is necessary to demonstrate an interference claim.  See Callison, 430 F.3d at 120 ("An interference action is . . . only about whether the employer provided the employee with the entitlements guaranteed by the FMLA").

Where an employee receives all of the benefits to which he or she is entitled by taking leave and then being reinstated to the same position from which he or she left, the employee cannot satisfy the fifth prong of the interference analysis.  Ross v. Gilhuly, 755 F.3d 185, 192 (3d Cir. 2014).  Any assertion that an employer took adverse actions against the employee after the FMLA leave or otherwise improperly considered FMLA leave as a factor in termination is more properly brought as a retaliation claim.  Id. ("[A]n argument that [an employer] interfered with [an employee's] entitlement to take FMLA leave free from later discrimination confuses interference with retaliation and is thus misdirected."); see also Capps v. Mondelez Global LLC, 147 F. Supp. 3d 327, 335 (E.D. Pa. 2015) (holding that an allegation that an employer has somehow used leave against an employee does not satisfy the fifth element of an interference claim), aff'd, 847 F.3d 144 (3d Cir. 2017).

The undisputed evidence here establishes that Plaintiff was approved for intermittent FMLA leave to care for her son's sickle cell illness and that every day she sought to take leave for that purpose was approved.  She was also approved to work at home as a Payroll Coordinator during the COVID-19 crisis to avoid the risk to her son, she was able to return to the Activity Director position if she chose to return to the building, and she was granted leave without discipline to not work on multiple days in March and April of 2020.  Plaintiff does not identify a single day that she sought to take FMLA leave

and was denied.  Indeed, Plaintiff's response brief does not even acknowledge her FMLA interference claim.  Accordingly, I will grant Defendant's Motion for Summary Judgment on this claim.

### 2.  FMLA Retaliation Claim

"To succeed on an FMLA retaliation claim, a plaintiff must show that "(1) he invoked his right to FMLA-qualifying leave, (2) he suffered an adverse employment decision, and (3) the adverse action was causally related to his invocation of rights." Ross, 755 F.3d at 193 (quoting Lichtenstein v. Univ. of Pittsburgh Med. Ctr., 691 F.3d 294, 302 (3d Cir. 2012)).  "Because FMLA retaliation claims require proof of the employer's retaliatory intent, courts have assessed these claims through the lens of employment discrimination law.  Accordingly, claims based on circumstantial evidence have been assessed under the burden-shifting framework established in McDonnell Douglas[.]" Lichtenstein, 691 F.3d at 302.  If the plaintiff presents a prima facie case, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its decision.  Id.  If the defendant meets this "minimal burden," "the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Fuentes v. Perksie, 32 F.3d 759, 763 (3d Cir. 1994).

Here, Defendant contends that Plaintiff has failed to establish a *prima facie* case of actionable retaliation as she failed to produce any evidence that she invoked her right to "FMLA-qualifying leave" and that her termination was causally related to her invocation of FMLA rights.  Alternatively, Defendant contends that it has articulated a legitimate, nondiscriminatory reason for Plaintiff's termination and that Plaintiff has not produced any evidence from which a factfinder could reasonably either disbelieve Defendant's reason or believe that a discriminatory reason was more likely than not a motivating cause.

I agree that Plaintiff has failed to point to evidence from which a reasonable factfinder could conclude that her termination was causally connected to her use of FMLA-qualifying leave.  As set forth above with respect to her interference claim, Plaintiff's working at home was not FMLA leave.  Plaintiff

identifies no evidence raising any inference that her prior use of FMLA leave was the basis for her termination.

Even assuming there was sufficient evidence for a jury question on the issue of causation, Defendant has met its "minimal burden" of identifying a legitimate, non-discriminatory reason for its actions.  As described above, Plaintiff was given an accommodation to work part-time at home in her Payroll Coordinator position.   On several occasions in the brief time Plaintiff worked home, Plaintiff asked that another employee do her payroll tasks, and, during one period of time, she was found to have not logged in to Defendant's virtual private network, meaning she could not have accessed any of the payroll systems.  Yet, she continued to submit time for working.  When Gallagher confronted Plaintiff about these concerns, Plaintiff refused to participate in the discussion, declined to give a statement, and became defensive about inquiries into her productivity.   Gallagher noted that Plaintiff was then terminated for insubordination and well as falsification of her time records.

The burden now shifts back to Plaintiff to "point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Fuentes, 32 F.3d at 763.  Plaintiff has not done so. Indeed, Plaintiff merely references the same testimony she pointed to in connection with her ADA claim and argues that "[i]f Defendant and Defendant's Counsel cannot agree on Defendant's reason for terminating Plaintiff[,] a jury should decide whether Plaintiff's intermittent FMLA and her association with a disabled person were factors in Defendant's decision to terminate Plaintiff's employment." (Pl.'s Resp. Opp'n Summ J. 7.)  Such a speculative inference from this cited deposition testimony is insufficient to satisfy her summary judgment burden and create a genuine issue of material fact.  As such, I will grant summary judgment on this claim in favor of Defendant.

## C. FFCRA Claim

In Count IV of her Amended Complaint, Plaintiff brings a claim under the Families First Coronavirus Response Act ("FFCRA"). Plaintiff asserts that she was unable to work because of a *bona fide* need to care for her son for reasons related to COVID-19 but Defendant (a) failed to provide her with the required twelve weeks of paid sick leave under that Act and (b) terminated her for asserting her rights under the FFCRA. Defendant responds that even if Plaintiff could prove a violation of FFCRA's provisions, it is entitled to summary judgment under a good faith defense.

In March 2020, Congress passed the FFCRA to offer sick and emergency family leave to employees who could not work due to the COVID-19 pandemic. Pub. L. No. 116-127, 134 Stat. 178 (Mar. 18, 2020); see also Gracia v. Law Officers of Alexander E. Borell, P.A., 535 F. Supp. 3d 1268, 1270–71 (M.D. Fla. Apr. 19, 2021) (explaining that the "broad purpose" of one portion of the FFCRA is to "obviate the pressure on employees 'to choose between their paycheck and their health' " (quoting 166 Cong. Rec. H.1675-09, H1689 (daily ed. Mar. 13, 2020) (statement of Rep. Scott))); Jones v. Eastern Airlines, LLC, No. 20-cv-1927, 2021 WL 2456650, at *4 (E.D. Pa. June 16, 2021)("The purpose of the FFCRA is to provide relief to American workers and to promote public health.").

The FFCRA has two main sections. The first is the "Emergency Paid Sick Leave Act" (the "EPSLA"), which requires an employer to "provide to each employee . . . paid sick time to the extent that the employee is unable to work (or telework) due to a need for leave because [t]he employee is caring for a son or daughter [and] the school or place of care of the son or daughter has been closed, or the child care provider of such son or daughter is unavailable, due to COVID-19 precautions." FFCRA §5102(a)(5), 134 Stat. 195 (2020); see also Piotrowski v. Signature Collision Ctrs., LLC, No. 21-cv-02115, 2021 WL 4709721, at *1 (E.D. Pa. Oct. 8, 2021). An employer who fails to pay wages to a qualifying employee as required by § 5102 of the EPSLA is "considered to have failed to pay minimum wages in violation of section 6 of the FLSA (29 U.S.C. § 206)." FFCRA § 5105(a)(1), 134 Stat. 197 (2020). The EPSLA also renders it "unlawful for any employer to discharge, discipline,

or in any other manner discriminate against any employee, who—(1) takes leave in accordance with this Act; and (2) has filed any complaint or instituted or caused to be instituted any proceeding under or related to this Act . . . ."  FFCRA § 5104, 134 Stat. 196 (2020).

The second relevant portion of the FFCRA is the "Emergency Family and Medical Leave Expansion Act" ("EFMLEA"), which builds off the FMLA and entitles "an eligible employee . . . to a total of 12 workweeks of leave during any 12-month period . . . because of a qualifying need related to a public health emergency in accordance with section 2620 of this title."  29 U.S.C. § 2612(a)(1)(F). Section 2620 defines an "eligible employee" as any "employee who has been employed for at least 30 calendar days by the employer," and it defines "qualifying need related to a public health emergency" to mean "the employee is unable to work (or telework) due to a need for leave to care for the son or daughter under 18 years of age of such employee if the school or place of care has been closed, or the child care provider of such son or daughter is unavailable, due to a public health emergency."  Id. § 2620(a)(2)(A). A violation of the EFMLEA is a violation of the FMLA.

The FFCRA also includes a provision which allows the Secretary of Labor to issue regulations "to exclude certain health care providers and emergency responders from the definition of employee under section 5110(1) including by allowing the employer of such health care providers and emergency responders to opt out."  FFCRA § 5111; see also Payne v. Woods Services, Inc., 520 F. Supp. 3d 670, 676 (E.D. Pa. 2021).  Consistent with that authority, in April 2020, the Department of Labor issued a Final Rule defining "health care provider" under the FFCRA as:

> *[A]nyone employed at* any doctor's office, hospital, health care center, clinic, post-secondary educational institution offering health care instruction, medical school, local health department or agency, nursing facility, retirement facility, *nursing home*, home health care provider, any facility that performs laboratory or medical testing, pharmacy, or any similar institution, Employer, or entity.  This includes any permanent or temporary institution, facility, location, or site where medical services are provided that are similar to such institutions.

85 Fed. Reg. 19,326 (§ 826.25) (Apr. 6, 2020) ("April Rule") (emphasis added).

Subsequently, however, this definition was struck down as inconsistent with the FFCRA by a court in the Southern District of New York.  See New York v. United States Dept. of Labor, 477 F. Supp. 3d 1, 15 (S.D.N.Y. 2020).  The Department of Labor then revised the definition of "health care provider," and the new Rule took effect on September 16, 2020.  See 29 C.F.R. § 826.30 ("September Rule").  Because the September Rule has been deemed to not apply retroactively, and because the April rule was found to be unlawful, the definition of "health care provider" as found in the FMLA is the one that applies to situations before September 16, 2020.[2]  Spells v. Physician and Tactical Healthcare Servs., LLC, No. 20-cv-6213, 2022 WL 2816950, at *11 (D.N.J. July 19, 2022); Payne, 520 F. Supp. 3d at 677.

Here, Defendant contends that, given this legislative history, it cannot be held liable because it relied in good faith on the Department of Labor's regulations and guidance regarding the April Rule's health care provider exemption to the FFCRA's entitlement to paid sick leave and, accordingly, based its employment decisions on that exemption.  I find merit to this argument.

The FFCRA is only enforceable through the Fair Labor Standards Act, which includes an affirmative defense of good faith—set forth in Section 259 of the Portal-to-Portal Act of 1946, 29 U.S.C. § 259—that provides "an absolute defense for employers who rely on DOL regulations and guidance to make decisions, even if those regulations and guidance are later invalidated."  Spells, 2022 WL 2816950, at *12.  Specifically, § 259 provides, in pertinent part.

> [N]o employer shall be subject to any liability or punishment for or on account of the failure of the employer to pay minimum wages or overtime compensation under the Fair Labor Standards Act of 1938, as amended, the Walsh-Healey Act, or the Bacon-Davis Act, if he pleads and proves that the act or omission complained of was in good faith in conformity with and in reliance on any written administrative regulation, order, ruling, approval, or interpretation, of the agency of the United States specified in subsection (b) of this section, or any administrative practice or enforcement policy of such agency with respect to the class of employers to which he belonged.  Such a defense, if established, shall be

---

[2]  The FMLA defines a health care provider as "(A) a doctor of medicine or osteopathy who is authorized to practice medicine or surgery (as appropriate) by the State in which the doctor practices; or (B) any other person determined by the Secretary to be capable of providing health services."  29 U.S.C. § 2611(6).  Under this definition, Plaintiff would not be deemed a health care provider.

a bar to the action or proceeding, notwithstanding that after such act or omission, such administrative regulation, order, ruling, approval, interpretation, practice, or enforcement policy is modified or rescinded or is determined by judicial authority to be invalid or of no legal effect.

29 U.S.C. § 259.  To establish a Section 259 defense, the employer must demonstrate that "it acted: (1) in good faith, (2) in conformity with, and (3) in reliance on the specified agency's writing, practice, or policy."  In re Cargill Meat Solutions Wage and Hour Litig., 632 F. Supp. 2d 368, 389–90 (M.D. Pa. 2008); Johnson v. Nat'l Collegiate Athletic Ass'n, 556 F. Supp. 3d 491, 502–03 (E.D. Pa. 2021) (citing same).  The employer bears the burden of proving entitlement to a § 259 exception.  In re Cargill, 632 F. Supp. 2d at 389.

Defendant has established each of the three elements.  According to the undisputed evidence, Saber Healthcare Group ("Saber") is an organization that provided back office and consulting services to Defendant during the relevant time period, including guidance and information regarding requirements and developments in laws applicable to Defendant's employees.  (DSUF ¶¶ 141, 146.) During the initial weeks of the pandemic in March and April 2020, Kelly Wright and Judy Kaneen of Saber provided Defendant with weekly Human Resources Updates, which contained information on developing areas of the law.  (Id. ¶ 148.)  In the April 3, 2020 HR Update, Ms. Wright specifically referenced the Department of Labor's rules and guidance on its website, which clearly state that "healthcare providers" was defined to include "anyone employed at any . . . nursing facility, retirement facility, nursing home, home health care provider . . . or similar institution, employer, or entity."  (Id. ¶ 152.)  Ms. Wright also referenced Question 56 of the DOL's frequently asked FFCRA questions, which stated that employees of nursing care facilities like Defendant were exempt from the provisions because they were considered healthcare providers.  (Id. ¶ 153.)  Based on this information, Wright and Kaneen advised Defendant that they were exempt from the paid sick leave and expanded FMLA leave provisions under the FFCRA and/or the FMLA.  (Id. ¶¶ 154–58.)  Ms. Kaneen specifically provided guidance to Ryan Gallagher in handling leave-related issues related to Plaintiff.  (Id. ¶ 166.)  Based on that guidance,

and additional guidance he received from his corporate office, Gallagher understood that Defendant and all of its employees were exempt from the leave provisions of the FFCRA.  (Id. ¶ 167.)  In addition, it is uncontested that Plaintiff never requested a paid leave of absence under the FFCRA and was not seeking paid leave under the FFCRA at any time she took leave from Defendant.  (Id. ¶¶ 168–171.)

Based on this undisputed evidence, Defendant has established an entitlement to the good faith defense, which insulates it from liability under the FFCRA.  Plaintiff has not addressed her FFCRA claim, let alone offered any basis on which a jury could find that the good faith defense does not apply.  Absent an issue of material fact, I will grant summary judgment in favor of Defendant on Plaintiff's FFCRA claim.[3]

**D. Defamation**

Plaintiff's last remaining claim alleges that Defendant defamed her to her potential future employer, Brooke Glen.  In support, Plaintiff first notes that, in the PreCheck Report, her dates of employment were listed as being from September 1, 2020 to October 2, 2020, which is incorrect.  Second, the PreCheck Report indicates that Plaintiff had been terminated for "falsification of records."  Defendant seeks summary judgment on this claim.

In Pennsylvania, the burden of proof for defamation action is set forth by statute:

> (a) *Burden of plaintiff.*—In an action for defamation, the plaintiff has the burden of proving, when the issue is properly raised:
>
> (1) The defamatory character of the communication.
> (2) Its publication by the defendant.
> (3) Its application to the plaintiff.
> (4) The understanding by the recipient of its defamatory meaning.
> (5) The understanding by the recipient of it as intended to be applied to the plaintiff.

---

[3]     The Amended Complaint also asserts an FFCRA retaliation claim alleging that Defendant's motivation in terminating her was causally related to her assertion of FFCRA leave.  Although it is unclear whether Plaintiff is pressing her FFCRA retaliation claim given her failure to address Defendant's Motion on these issues, I nonetheless find that summary judgment on retaliation is warranted for two reasons.  First, Defendant's good faith defense under § 259 precludes Plaintiff from establishing the requisite retaliatory animus necessary for such a claim.  See Spells, 2022 WL 2816950, at *18.  Moreover, for the same reasons set forth with respect to Plaintiff's FMLA retaliation claim, Plaintiff fails to produce any evidence to establish the causal connection element of a retaliation claim.

(6) Special harm resulting to the plaintiff from its publication.

(7) Abuse of a conditionally privileged occasion.

42 Pa. Cons. Stat. § 8343(a).

Defendant offers several challenges to Plaintiff's claim.  First, it alleges that the statement regarding her dates of employment were not capable of defamatory meaning.  Second, Defendant contends that there is no admissible evidence that it published any statement.  Third, Defendant claims that Plaintiff fails to show special harm.  Fourth, Defendant claims that its statements were subject to a conditional privilege, which Plaintiff has not shown was abused.  Finally, Defendant posits that even if Plaintiff could establish all of the elements, Defendant has produced sufficient evidence to establish that the alleged statement as to Plaintiff's discharge was true.

1.   Whether the Statements Were Defamatory

"[U]nder Pennsylvania law, the Court acts as a gatekeeper to determine whether the statements are incapable of defamatory meaning in deciding whether any basis exists to proceed to trial." Mzamane v. Winfrey, 693 F. Supp. 2d 442, 480 (E.D. Pa. 2010).  In making this threshold determination, a court must note that a statement is defamatory "if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." Graboff v. Colleran Firm, 744 F.3d 128, 136 (3d Cir. 2014) (citation and internal quotation marks omitted).  "Pennsylvania courts recognize that a claim for defamation may exist where the words utilized themselves are not defamatory in nature, however, the context in which these statements are issued creates a defamatory implication, *i.e.*, defamation by innuendo." Mzamane, 693 F. Supp. 2d at 477.  In order to succeed on such a claim, the innuendo must be warranted, justified, and supported by the publication.  Id. at 478.

Defendant concedes that its statement regarding Plaintiff being discharged for falsification of records is likely capable of defamatory meaning.  It contends, however, that its statement regarding Plaintiff's dates of employment, even if erroneous, was defamatory.  I disagree.  Plaintiff was required

to report her dates of employment to PreCheck at the request of Brooke Glen.  Although she herself inaccurately reported the dates as January 2018 to April 2020 (27 months)—when her actual dates of employment were October 2018 to April 2020 (19 months)—Defendant's equally inaccurate reporting of dates of employment from September 1, 2020 to October 2, 2020 could have created the inference that Plaintiff was purposefully lying by drastically extending her work experience.  Viewed in the light most favorable to Plaintiff, such a statement could tend to harm Plaintiff's reputation.

2.   <u>Whether Defendant Published the Statements</u>

Defendant next contends that Plaintiff has failed to adduce any admissible evidence establishing that Defendant actually published any statement.

Plaintiff's defamation claim relies on the PreCheck Report, prepared by a third party.  The Pre-Check Report states, in pertinent part:

> 6/08/21 2:29 PM MST – According to internet research I called (215) 641-0600.  Gionna Banks verified this employment information verbally . . .
>
> **ALERT** Verified dates do not match applicant's dates.  There are no additional dates or position titles listed in the applicant's employee file.
>
> The Source stated that the job titles are about the same.
>
> Rehire Eligibility: No, Violated Company Policy
>
> Reason for Leaving: Discharged, Falsification of records
>
> 05/2721 -7:31 am MST – I called 215-643-0600 and spoke with Gionna Banks, HR Director, who verified the applicant's Employment history. . . .

(Huff Dep., exh. 31.)

Although Plaintiff claims to have been unable to depose Gionna Banks because she left Defendant's employment, she provides her own deposition testimony wherein she averred that Gionna Banks published the statements about her:

24

Q.  You authorized Brooke Glen to perform a background check of you right?

A.  Correct.

Q.  And you understood what that would entail?  That they were going to contact previous employers and stuff like that?

A.  Yes.

Q.  [Reading from Amended Complaint] "On May 27, 2021, and in response to Brooke Glen's inquiry as to Huff's employment background, Banks falsely reported that defendant terminated Huff's employment for falsification of records.  Banks also falsely reported that defendant employed Huff from September 1, 2020, through October 2, 2020."  Did I read that correctly?

A.  Yes.

Q.  How do you know Gionna Banks said that?

A.  Because when my offer was rescinded, I asked them [Brooke Glen] what happened, and they told me exactly what happened and who to call.  And when I spoke with them, they sent me a transcript of the call with Gionna Banks.

Q.  You have a transcript of the call with Gionna Banks?

A.  Yes.

Q.  From PreCheck?

A.  Yes.

. . .

Q.  Do you have a transcript, or do you have the PreCheck report?

A.  Well, pre—transcript of their conversation, precheck report, same thing.

Q.  Well, it's— I'm not trying to argue.  Let me—let me pull this up.  I'm going to show you what's been previously marked as Exhibit 31 [the PreCheck report].

A.  Okay.

. . .

Q.  So this is the document you're referring to when you say a transcript?

A.  Yes.

Q.  You don't have a recorded statement of whatever Gionna Banks allegedly said directly to PreCheck, this is just the report that you have?

A.  Yes.  That's what they sent me.

Q.  Okay.  And you received this in response to an inquiry about what was said at the background check?

A.  Yes.

Q.  But this document is not completed by Gionna Banks, right?

A.  No.  That's completed by PreCheck.

(Huff Dep. 278:22–281:13.)

Plaintiff's reliance on this testimony disregards its multiple layers of inadmissible hearsay.

Assuming that Plaintiff is correct that Ms. Banks was unavailable for deposition, and assuming further

that Ms. Bank's statement to the PreCheck employee is not being offered for the truth of the matter

asserted, Plaintiff still fails to overcome hearsay obstacles.[4]  The PreCheck Report, is, in itself, hearsay and does not directly attribute any particular statement to Ms. Banks.  Plaintiff does not offer an affidavit or any deposition testimony from the PreCheck employee who prepared the report.  Moreover, Plaintiff's testimony about her conversation with a Brooke Glen employee has three levels of hearsay: Ms. Banks's statement to the PreCheck employee, the PreCheck employee's report to Brooke Glen, and Brooke Glen's conversation with Plaintiff.  Plaintiff does not offer either affidavits or deposition testimony from anyone at Brooke Glen.

Generally, hearsay is not admissible in court.  Fed. R. Evid. 802.  In order to survive summary judgment, a non-moving party must point to admissible evidence which establishes the existence of a genuine issue of material fact.  Fed. R. Civ. P. 56(e).  Hearsay statements may be considered at summary judgment only if they are capable of admission at trial.  Shelton v. Univ. of Medicine & Dentistry of NJ, 223 F.3d 220, 223 n.2 (3d Cir. 2000); see also Burch v. WDAS AM/FM, No. 00-cv-4852, 2002 WL 1471703, at *3 (E.D. Pa. June 28, 2002) (granting summary judgment where plaintiff "presented no competent evidence that [defamatory] statements were made.  His claim rests entirely on his hearsay testimony that fellow employees and an employee [at another employer] told him that they had heard or heard from others of such statements. . . . no sworn statement of any kind from the other purported witnesses was presented."); Tolliver v. Trinity Parish Found., No. 14-cv-1021, 2017 WL 3288119, at *15–16 (D. Del. Aug. 2, 2017) (finding summary judgment to defendant was warranted on defamation claim, in part because the claim rested on an out-of-court statement in an email offered for the truth of the matter asserted, i.e., that the alleged defamatory statement at issue had been made)).

None of the evidence proffered by Plaintiff, other than potentially the PreCheck Report itself, is admissible.  In turn, such evidence cannot be used to defeat summary judgment.

---

[4]      An out-of-court statement is not hearsay when it is introduced for the purpose of establishing that the statement was made and not to establish its truth; to explain a course of conduct; or to reflect the declarant's state of mind.  See Talley v. Christiana Health System, No. 17-cv-926, 2019 WL 5102926, at *17 (D. Del. Oct. 9, 2019).  Here, the alleged statement by Ms. Banks is being offered only to prove that it was made and not for its truth.

      3.   Special Harm

Defendant also contends that Plaintiff has failed to prove "special harm."  One of the requirements under the Pennsylvania defamation statute is that the plaintiff prove that he/she suffered special harm.  42 Pa. Cons. Stat. § 8343(a)(6).  Special harm requires proof of a specific monetary or out-of-pocket loss as a result of the defamation.  Synygy, Inc. v. Scott-Levin, Inc., 51 F. Supp. 2d 570, 580 (E.D. Pa. 1999).  Special harm may constitute a loss of expected employment or a reasonable expectation of gain.  Rest. Torts § 575, cmt. b.

Defendant contends that Plaintiff has not produced any admissible evidence that the reason for the revocation of her Brooke Glen employment offer was the alleged defamatory statements by Defendant.  The email from Brooke Glen rescinding employment stated, "[a]fter reviewing your employment history and PreCheck background report, you do not meet the minimum requirements for the Mental Health Technician position.  We require a Bachelor's degree in human services or 2 years' experience in direct care plus your High School Diploma that must be verified by our third party."  (Huff Dep., exh. 32.)  When Plaintiff wrote back that she "explained [her] education and experience during the interview process," Brooke Glen indicated, "[w]e verify all employment through PreCheck and what they returned to us was significantly different than what your resume indicated.  In addition they disclosed the reason for termination which concerned us."  (Huff Dep., exh. 32.)

Absent any declaration or testimony from Brooke Glen, such an email—which is inadmissible hearsay—does not suffice to show that her employment was rescinded due to any statement from Defendant.  Plaintiff was required to have two years of experience, yet she only worked with Defendant for nineteen months,[5] and PreCheck was unable to verify Plaintiff's prior reported employment with Stenton Health and Rehab.  Although the Brooke Glen employee also noted some concern with

---

[5]    As I noted previously, the PreCheck report listed Plaintiff's date of employment with Defendant as September 1, 2020 to October 2, 2020, which was clearly wrong.  Assuming *arguendo* that this inaccuracy is fully attributable to Defendant, Plaintiff still could not show the requisite experience for the Brooke Glen job as she only worked for Defendant for nineteen months, from October 2018 to April 30, 2020.

Plaintiff's reason for termination, Plaintiff has offered no admissible evidence from Brooke Glen from which a reasonable juror could find that Defendant's statements in fact caused Plaintiff to lose her position with Brooke Glen.

      4.  <u>Conditional Privilege</u>

Finally, Defendant contends that its statements are subject to a conditional privilege and that Plaintiff has not produced any evidence to establish that such privilege was abused.

A properly stated defense of conditional privilege will relieve a defendant of liability even where the court concludes that a communication is capable of a defamatory meaning.  <u>Emekekwue v. Offor</u>, 26 F. Supp. 3d 348, 364 (M.D. Pa. 2014).  Communications are privileged when they are "made on a proper occasion, from a proper motive, in a proper manner, and based on reasonable cause . . . ."  <u>Id.</u> (quoting <u>Choi v. Sohn</u>, No. 01-cv-1782, 2004 WL 627060, at *3 (E.D. Pa. Mar. 1, 2004) (further quotations omitted))).  "Stated differently, a conditional privilege arises 'whenever circumstances are such as to lead any one of several persons having a common interest in a particular subject matter correctly or reasonably to believe that facts exist which another sharing such common interest is entitled to know."  <u>Id.</u> (quoting <u>Tucker v. Merck & Col., Inc.</u>, 102 F. App'x 247, 352–54 (3d Cir. 2004)).  Pennsylvania law "recognizes the defense of a conditional privilege whenever a prior employer evaluates a former employee at the request of a prospective employer."  <u>Zuschek v. Whitmoyer Labs., Inc.</u>, 430 F. Supp. 1163, 1165 (E.D. Pa. 1977), <u>aff'd</u>, 571 F.2d 573 (3d Cir. 1978); <u>see also</u> <u>Daywalt v. Montgomery Hosp.</u>, 573 A.2d 1116, 1118 (Pa. Super. Ct. 1990) (holding that a conditional privilege "applies to private communications among employers regarding discharge and discipline).

Once a matter is deemed conditionally privileged, the burden shifts to the plaintiff to prove that the defendant abused the conditional privilege.  <u>Howard v. Kelinski</u>, No. 01-cv-4171, 2002 WL 31501850, at *1 (3d Cir. 2002).  An abuse occurs when the publication is actuated by malice or negligence, is given for purpose other than that for which the privilege applies, or to a person not reasonably believed to be necessary for the accomplishment of the purpose of the privilege, or includes

defamatory matter not reasonably believed to be necessary for the accomplishment of the purpose. Beckman v. Dunn, 419 A.2d 583, 588 (Pa. Super. 1980).

Plaintiff does not acknowledge the existence of a special privilege. In turn, she does not present any evidence from which a reasonable juror could find that Defendant abused the privilege. Therefore, summary judgment on this claim is warranted.[6]

## IV.    CONCLUSION

For the reasons set forth above, I will grant Defendant's Motion for Summary Judgment in its entirety.

---

[6]    Defendant also argues that the challenged statements were true, which negates a finding of defamation. As I found that Plaintiff has failed to meet her summary judgment burden on any of the elements of a defamation claim, I need not separately address this defense.